**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Enrichetta Robey, | : | Civil Action |
| | : | |
| Plaintiff | : | No. |
| | : | |
| vs. | : | **Jury Trial Demanded** |
| | : | |
| StoneMor, Inc., Aimee Distler, Brian Friedman, and Matt Sobon, | : | |
| | : | |
| | : | |
| Defendants | : | |

# COMPLAINT

## INTRODUCTION

1. Plaintiff Enrichetta Robey ("Robey") is suing her former employer, StoneMor, Inc. ("StoneMor"), and her former bosses, Aimee Distler ("Distler"), Brian Friedman ("Friedman"), and Matt Sobon ("Sobon"), for subjecting her to a sexually hostile work environment, discriminating against her based on her sex and her association with a disabled child, and retaliating against her for engaging in protected activity.

2. Robey brings her case under the under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et. seq.* (the "ADAAA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. C.S.A. §§ 951, *et seq*. ("PHRA"). Robey seeks back pay, reinstatement or front pay, loss of earnings capacity, compensatory damages, punitive damages (under the ADAAA and Title VII only), interest, negative tax consequence damages, injunctive relief, and attorney's fees and costs.

## JURISDICTION AND VENUE

3. This Court has original jurisdiction to hear this action and adjudicate Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343. This Court has jurisdiction over Robey's state law claims pursuant to 28 U.S.C. § 1367(a).

4. All jurisdictional prerequisites to bringing this action have been satisfied because:

(a) On November 24, 2020, Plaintiff filed a timely Complaint with the Pennsylvania Human Relations Commission ("PHRC"), which Plaintiff dual-filed with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff is requesting a Notice of Right to Sue regarding this Charge;

(b) On September 9, 2021, Plaintiff filed a timely Charge of Discrimination with the EEOC, which Plaintiff amended on October 19, 2021. On July 13, 2022, the EEOC issued a Notice of Right to Sue regarding this Charge.

5. Venue is appropriate in the Eastern District of Pennsylvania because the events or omissions giving rise to Robey's claims occurred therein and because Defendants are doing business and/or may be served with process therein.

## THE PARTIES

6. Robey is an adult female individual and is a citizen and resident of the United States. Plaintiff resides in Philadelphia, Pennsylvania.

7. StoneMor is a domestic for profit corporation organized in Delaware. StoneMor's principal executive offices are located at 3331 Street Road, Suite 200, Bensalem, Pennsylvania 19020.

8. StoneMor is a publicly traded company listed on the New York Stock Exchange.

9. According to its website, StoneMor operates 305 cemeteries and 73 funeral homes in 24 states and Puerto Rico. *See* https://www.stonemor.com/investors (accessed October 10, 2022).

10. Upon information and belief, StoneMor employees approximately 1,800 employees.

11. Distler is an adult individual and is a citizen and resident of the United States. Distler's principal place of business is located at Resurrection Cemetery, 5201 Hulmeville Road, Bensalem, PA 19020.

12. At all relevant times, Distler was a Family Service Counselor and an Assistant Manager of Resurrection Cemetery.

13. Friedman is an adult individual and is a citizen and resident of the United States. Upon information and belief, Friedman resides in Marlton, NJ.

14. At all relevant times, Friedman was Sales Director of Resurrection Cemetery.

15. Sobon is an adult individual and is a citizen and resident of the United States. Sobon's principal place of business is located at 3331 Street Road, Suite 200, Bensalem, Pennsylvania 19020.

16. At all relevant times, Sobon was Vice President of Sales and Operations of StoneMor's Eastern Division, which includes Resurrection Cemetery.

17. At all material times hereto, StoneMor acted through its employees, agents, representatives and/or servants who were acting within the course and scope of their employment and authority.

## FACTUAL BACKGROUND

### Plaintiff's Employment with StoneMor

18. On August 14, 2017, StoneMor hired Robey to work as a Family Service Counselor at Resurrection Cemetery in Bensalem, PA.

19. Due to her exemplary work performance, StoneMor promoted Robey to Senior Family Service Counselor in August 2018.

20. As a Senior Family Service Counselor, Robey's job duties included at-need and pre-need sales of burial space, vaults, and caskets; writing contracts for at-need and pre-need sales; selling and designing at-need and pre- need headstones and benches; meeting with families to set up for services; opening and closing of graves; setting appointments with families to educate them on the importance of pre- planning; working on a CRM and docket scan; taking calls from funeral directors; and paperwork for Internet authorizations.

21. At all relevant times, Robey was qualified for the Family Service Counselor position because of her prior relevant work experience, which included collections and calls center experience. Also, Robey's loss of her husband helped her educate families about pre-planning.

22. Further, during Robey's employment with StoneMor, Robey met or exceeded StoneMor's reasonable expectations for the Senior Family Service Counselor position. Robey received reviews every six months, which were always good.

23. In 2020, Robey's last full year of employment with StoneMor, Robey had over $700,000.00 in sales volume and ranked number 49 of the top 118 counselors and was in the top 10 of the Archdiocese of Philadelphia Catholic cemetery counselors.

**StoneMor Discriminates Against Robey Regarding Her Work Schedule and Duty Days**

24. In September 2006, Robey's minor son (Jake) was diagnosed with Autism Spectrum Disorder ("ASD"), which is a mental impairment that is a disability under the ADAAA.

25. From August 2017 to August 2019, Robey's manager was Sales Director Juan Santiago ("Santiago"). Robey had a great working relationship with Santiago.

26. While working for Santiago, Robey requested a scheduling change that would allow her to leave early on Wednesdays so that she could be home with her autistic minor son for his to reading and math tutor sessions. Santiago routinely granted Robey this schedule change.

27. In August 2019, StoneMor transferred Santiago to another StoneMor location.

28. Friedman replaced Santiago. Several issues arose from that point forward.

29. Shortly after Friedman replaced Santiago, Friedman began scheduling Robey for duty days on Wednesdays, knowing that Robey had to leave early for her autistic minor son's tutor sessions.

30. Working a "duty day" meant that when an at-need call came in, Robey would automatically get that call. Being on duty gave Robey the opportunity to meet with families and make sales.

31. When Robey reminded Friedman that she needed to leave early on Wednesdays for her autistic minor son's tutor sessions, Friedman informed Robey that she would have to give up her duty day, which would result in Robey losing at-need and pre-need sales.

32. By contrast, Friedman allowed other Family Service Counselors to leave work early for various reasons, including childcare reasons, without taking their duty days away. Instead, Friedman often ran appointments for these Family Service Counselor and made sales for these

Family Service Counselors and the Family Service Counselors were able to receive commissions for these sales.

33. In August 2019, Robey's father was in hospitalized due to a terminal heart valve condition.

34. Despite her father's grave condition, Robey reported to work. Robey was on at-need duty that day, which meant that all at-need calls should have gone directly to Robey.

35. Robey requested to Friedman that she be able to leave early to see her father, who might die, in the hospital.

36. While Robey was still in the office, a potential client called. Friedman told Robey that he was assigning this client to Don Underwood ("Underwood"), Robey's male colleague.

37. Robey asked Friedman why she was not being assigned the potential client since it was her duty day; however, Friedman did not respond.

38. Robey advised Sobon of what happened who replied, "I am sorry Ms. Robey, go home and take care of your dad I will take care of it."

39. Following this incident, Friedman routinely assigned potential sales leads to other Family Service Counselors, regardless of whether it was Robey's duty day, causing Robey to lose sales and commissions.

40. On February 18, 2020, Friedman issued a Disciplinary Action Form to Robey, which falsely accused Robey of "inappropriate behavior / outburst."

**Distler and Friedman Subject Robey to a Sexually Hostile Work Environment; StoneMor Promotes Distler**

41. In June 2020, Robey's working situation changed dramatically.

42. That month, Distler, who was then a Family Service Counselor, began discussing her sex life in a lewd and intrusive manner. For example, Distler would brag about being the

"queen of blow jobs," lecture about blow job technique, and would describe—in detail—her boyfriend's sexual preferences. Distler also referenced her prior sexual partners' penises and repeatedly used the term "monster cock."

43. Distler's conduct was not welcomed by Robey.

44. Robey asked Distler to stop discussing these sexual matters and indicated that Distler was making Robey feel uncomfortable. Distler laughed in response. Distler's behavior continued.

45. From July 3, 2020 through July 10, 2020, Robey was on vacation in Florida.

46. Prior to going on vacation, Robey contacted StoneMor HR to ask if she needed to quarantine.

47. StoneMor HR representative Michele Dydak ("Dydak") told Robey that she did not have to quarantine.

48. After Robey returned, she received a message from Dydak telling her that she had to quarantine. Robey was forced to use her vacation time for three weeks, one of them unpaid, to abide by this directive.

49. Conversely, StoneMor did not require Robey's coworkers—including Friedman, Distler, and Underwood—to quarantine despite going on vacation to locations such as New Jersey, Maine, Georgia, and Maryland.

50. On or about August 1, 2020, StoneMor promoted Distler to Family Services Manager. As Family Services Manager, Distler was Robey's direct supervisor.

51. Distler's inappropriate behavior continued—Distler continued to describe her sex life in lewd and graphic terms.

52. Distler's conduct was not welcomed by Robey.

53. Robey continued to ask Distler to stop, but to no avail. Rather, Distler's conduct escalated.

54. Distler, apparently taking her lead from Friedman's practice, began assigning sales leads to counselors other than Robey. When Robey asked Distler why she was being denied these leads, Distler simply responded that she and Friedman had decided that other counselors should be given these opportunities.

55. Between August 1, 2020 and December 2020, Distler "reassigned" approximately six sales were away from Robey. Robey estimates that these sales would have generated approximately $5,000.00 in commission income.

56. Another day in August 2020, Distler saw Friedman walking around the office. Distler commented, "Brian wears his tight pants and you can see the outline of his penis."

57. A few days later, it was only Robey, Distler, and Friedman in the office. Friedman walked to Distler and said, "I wore my tight pants for my girls today," presumably referring to Distler and Robey.

58. Friedman's conduct was not welcomed by Robey.

59. On August 15, 2020, Robey reported Distler's behavior, which included the creation of a hostile work environment and her reassignment of sales leads, to Sobon.

60. Robey asked Sobon if StoneMor could transfer her to another location.

61. Sobon said he would look into the assignment of sales leads but stated that he did not think Robey could be transferred to another location.

62. A few days after speaking to Sobon, Friedman and Underwood called Robey into a conference room where they chastised Robey for making a complaint to Sobon.

63. Friedman then informed Robey that she would be receiving written discipline for "showing attitude." Friedman and Underwood then presented Robey with a written discipline warning for "attitude" and asked her to sign it. Robey refused to sign it and left the room.

64. On or about August 17, 2020, Robey was at her recently deceased cousin's house. Robey had access to her work phone and emails and was working from her cousin's house. Nevertheless, Friedman wrote Robey up for not working even though Robey had emails showing that she was still working and in fact made a sale to a customer for pre-plan plot.

65. On or about October 31, 2020, Distler again began making unsolicited and graphic comments about her sex life to Robey. Friedman overheard Distler's comments. Friedman approached Distler and said, "you are getting me excited." Friedman then rapidly began zipping his pants open and closed.

66. Distler and Friedman's conduct was not welcomed by Robey.

67. On November 1, 2020, two other StoneMor employees made anonymous complaints to StoneMor's HR Department about sexual harassment in the workplace.

68. In response to these complaints, Dydak convened a meeting on November 4, 2020 in order to discuss the complaints.

69. During this meeting, Robey again recounted the lewd and hostile manner in which Distler described her sex life in the workplace. Robey also explained that she had asked Distler to stop and that Friedman participated in Distler's behavior. Finally, Robey explained to Dydak that Distler had begun withholding the assignment of sales leads in retaliation for her complaints.

70. In response, Dydak assured Robey that they would investigate her complaints.

71. Despite Dydak's promise, StoneMor apparently failed to reprimand Distler or Friedman for their actions. Distler continued to make sexually inappropriate comments in the

workplace and continued to deny sales leads to Robey. Friedman continued to take sales and duty days away from Robey.

72. On November 5 or 6, 2020, Distler was eating a banana while she was sitting near Robey. Friedman walked by Distler and made a reference to the banana being shaped like a penis.

73. Around this time period, Friedman and Distler came up with a new office moniker for Robey, "the Italian hothead." This moniker was repeated several times a day, to the point that Mitsy, the office secretary, introduced Robey to Mitsy's husband at the supermarket as the "Italian hothead" that she worked with. Mitsy apologized for her comment the next day at work.

74. On or about November 5 or 6, 2020, Distler again commented that she could see the outline of Friedman's penis through his pants. Friedman overheard the comment and said, "I wore my tight pants for my girls today," again, presumably referring to Distler and Robey.

75. Distler and Friedman's conduct was not welcomed by Robey.

76. By email dated November 5, 2020, Robey emailed a written summary and complaint of the "Sexually Hostile work environment" to which Distler and Friedman had subjected Robey to Dydak. A true and correct copy of Robey's complaint is attached as Exhibit P-1.

77. Upon information and belief, several employees observed Distler and Friedman's sexual banter. In addition to Robey, Linda Nunn and Denise Lydniski, heard Friedman's "tight pants" comment. StoneMor employees Paul Kaufman and Debbie Holt also explained to Robey that they had heard Distler and Friedman use lewd sex terms in the workplace.

78. Several weeks later, Robey's daughter (Nicholena) began receiving text messages from her boyfriend (Dante Torres) regarding Robey's son (Joseph). Torres received the text messages from Distler's boyfriend (Dan). Dan's text messages made unfounded and inappropriate references about Joseph's sexual orientation.

79. On November 13, 2020, Distler reassigned another sales lead away from Robey. Robey again called Sobon for assistance. Sobon told Robey that he would look into it, but a days later, Sobon told Robey there was no findings.

80. Due to these circumstances, Robey's mental wellbeing deteriorated, and she began suffering from anxiety, panic attacks, insomnia, and night terrors.

81. Upon the advice of her primary care provider, Robey took a few days off from work to recover.

82. On November 23, 2020, Robey returned to work. Upon her return, Robey received a call from Sobon and an unknown HR manager. To Robey's shock, they advised her that after investigating, StoneMor concluded that there was no hostile work environment, and that Distler was not acting with retaliatory intent in assigning sales leads away from her.

83. On November 25, 2020, Robey observed Friedman whisper something inaudible to Distler. Distler responded in a loud and sarcastic tone to Friedman, "we cannot say that because we might get told on." Friedman laughed in response. Distler then repeated, "quiet Brian you cannot say that people might take it wrong."

84. Later that day, Linda (last name unknown), was sitting at her usual desk, which is across the room from Robey. Distler told Linda that she should relocate her desk to another location, because people in her location "whisper" about what they hear. Linda declined Distler's offer to move her desk.

**Robey Engages in Protected Activity; StoneMor Fires Robey**

85. On November 24, 2020, Robey filed a Complaint against StoneMor, Distler, Friedman, and Sobon with the PHRC in which Robey alleged that StoneMor, Distler, Friedman, and Sobon were discriminating against her because of her sex, her association with an individual

with a disability (her autistic minor son), and her national origin. Robey's PHRC Complaint also alleged a hostile work environment and retaliation.

86. By letter dated December 16, 2020, Robey's former attorney sent a letter to Austin So, Esquire, StoneMor's Senior Vice President, in which Robey alleged discrimination against her because of her sex, her association with an individual with a disability (her autistic minor son), and her national origin, a hostile work environment, and retaliation.

87. In December 2020, Robey again requested that Dydak and Sobon transfer her to another location. Robey requested to be transferred to Saints Peter and Paul Cemetery, which is a high volume cemetery; however, Sobon transferred Robey to Hillside Cemetery, which is a low volume cemetery.

88. On January 4, 2021, Robey began working at Hillside Cemetery. Sobon assured Robey that she could keep her families from Resurrection Cemetery; however, Sobon allowed other Resurrection Cemetery Family Service Counselors to do business with Robey's families.

89. After Friedman learned that Robey was being transferred, he did not schedule Robey for duty days.

90. On January 20, 2021, Robey's former attorney sent a letter to Dydak, which requested that StoneMor allow Robey to review her personnel file pursuant to Pennsylvania's Personnel File Inspection Act, 43 P.S. §1332.

91. On January 26, 2021, Sobon issued a Disciplinary Action Form to Robey, which states, in relevant part:

> An investigation was conducted due to concerns you raised that fellow employees were engaging in inappropriate behavior and unprofessional conduct by sending text messages that were of a sexual nature. Our investigation has since concluded and based on the findings, we were able to substantiate that you engaged in this inappropriate behavior.

92. In other words, Sobon disciplined Robey for complaining about sexual harassment.

93. By letter dated February 24, 2021, Danielle D. Mehallo, Esquire, StoneMor's Vice President and Assistant General Counsel, responded to Robey's former attorney's December 16, 2020 letter, denying Robey's allegations.

94. Upon information and belief, on March 4, 2021, the PHRC served Robey's Complaint on StoneMor, Distler, Friedman, and Sobon.

95. On April 19, 2021, StoneMor submitted its Answer and Affirmative Defenses to Robey's Complaint to the PHRC.

96. On April 26, 2021, StoneMor fired Robey during a telephone call with Sobon, Dydak, and Paul Mancini.

97. Dydak claimed that Robey was fired due to a "customer" complaint; however, the individual who complained about Robey was not a StoneMor customer.

**StoneMor and Distler Continue to Retaliate Against Robey**

98. In June 2021, Robey applied for a job at Roosevelt Cemetery in Bensalem, PA.

99. Robey had three interviews with Roosevelt Cemetery. Robey's third interview was July 6, 2021 at 12:00 p.m.

100. During the third interview, Roosevelt Cemetery informed Robey that they would be sending her the compensation information for the position and a criminal background check and drug test information.

101. Later on, July 6, 2021, Robey learned that she did not get the job at Roosevelt Cemetery.

102. Shortly after this, Robey learned that Distler told Roosevelt Cemetery negative things about Robey's job performance, which are not true.

**COUNT I**
**Associational Disability Discrimination (ADA and PHRA)**
**Robey v. StoneMor and Friedman**

103. Paragraphs 1-102 are incorporated by reference as if fully set forth herein.

104. The acts, failures to act, practices and policies of Defendants set forth above constitute disability discrimination (based on Robey's association with her autistic minor son) and violate the ADAAA and PHRA.

105. Friedman is sued individually under the PHRA (and not under the ADAAA) because he aided and abetted StoneMor's discriminatory conduct against Robey.

WHEREFORE, Robey respectfully demands judgment in her favor and against StoneMor and Friedman, jointly and/or severally, for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation and embarrassment, back pay, reinstatement or front pay, punitive damages (under the ADAAA only), interest, negative tax consequence damages, attorney's fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Robey's civil rights, equitable/injunctive relief directing Defendants to cease any and all unlawful disability discrimination against their employees, and such other relief as the Court deems proper.

**COUNT II**
**Retaliation (ADA and PHRA)**
**Robey v. StoneMor, Distler, Friedman, and Sobon**

106. Paragraphs 1-105 are incorporated by reference as if fully set forth herein.

107. The acts, failures to act, practices and policies of Defendants set forth above constitute disability retaliation in violation of the ADAAA and the PHRA.

108. Distler, Friedman, and Sobon are sued individually under the PHRA (and not under the ADAAA) because they aided and abetted StoneMor's retaliatory conduct against Robey.

WHEREFORE, Robey respectfully demands judgment in her favor and against StoneMor Distler, Friedman, and Sobon, jointly and/or severally, for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation and embarrassment, back pay, reinstatement or front pay, punitive damages (under the ADAAA only), interest, negative tax consequence damages, attorney's fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Robey's civil rights, equitable/injunctive relief directing Defendants to cease any and all unlawful disability discrimination against their employees, and such other relief as the Court deems proper.

**COUNT III**
**Sexual Harassment (Title VII and PHRA)**
**Robey v. StoneMor, Distler, and Friedman**

109. Paragraphs 1-108 are incorporated by reference as if fully set forth herein.

110. The acts, failures to act, practices and policies of Defendants set forth above constitute sexual harassment in violation of Title VII and the PHRA.

111. Distler and Friedman are sued individually under the PHRA (and not under Title VII) because they aided and abetted StoneMor's harassing conduct against Robey.

WHEREFORE, Robey respectfully demands judgment in her favor and against StoneMor Distler, and Friedman, jointly and/or severally, for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation and embarrassment, back pay, reinstatement or front pay, punitive damages (under Title VII only), interest, negative tax consequence damages, attorney's fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Robey's civil rights, equitable/injunctive relief directing Defendants to cease any and all unlawful disability discrimination against their employees, and such other relief as the Court deems proper.

**COUNT IV**
**Sex Discrimination (Title VII and PHRA)**
**Robey v. StoneMor, Friedman, and Sobon**

112. Paragraphs 1-111 are incorporated by reference as if fully set forth herein.

113. The acts, failures to act, practices and policies of Defendants set forth above constitute sex discrimination and violate Title VII and the PHRA.

114. Friedman and Sobon are sued individually under the PHRA (and not under Title VII) because they aided and abetted StoneMor's discriminatory conduct against Robey.

WHEREFORE, Robey respectfully demands judgment in her favor and against StoneMor, Friedman, and Sobon, jointly and/or severally, for compensatory damages for emotional distress, career damage, loss of earnings capacity, mental anguish, humiliation and embarrassment, back pay, reinstatement or front pay, punitive damages (under Title VII only), interest, negative tax consequence damages, attorney's fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Robey's civil rights, equitable/injunctive relief directing Defendants to cease any and all unlawful disability discrimination against their employees, and such other relief as the Court deems proper.

**COUNT V**
**Retaliation (Title VII and PHRA)**
**Robey v. StoneMor, Distler, Friedman, and Sobon**

115. Paragraphs 1-114 are incorporated by reference as if fully set forth herein.

116. The acts, failures to act, practices and policies of Defendants set forth above constitute disability retaliation in violation of Title VII and the PHRA.

117. Distler, Friedman, and Sobon are sued individually under the PHRA (and not under Title VII) because they aided and abetted StoneMor's retaliatory conduct against Robey.

WHEREFORE, Robey respectfully demands judgment in her favor and against StoneMor Distler, Friedman, and Sobon, jointly and/or severally, for compensatory damages for emotional

distress, career damage, loss of earnings capacity, mental anguish, humiliation and embarrassment, back pay, reinstatement or front pay, punitive damages (under Title VII only), interest, negative tax consequence damages, attorney's fees plus costs, declaratory relief that the conduct engaged in by Defendants violated Robey's civil rights, equitable/injunctive relief directing Defendants to cease any and all unlawful disability discrimination against their employees, and such other relief as the Court deems proper.

**COUNT VI**
**Tortious Interference with Business Relations**
**Robey v. StoneMor and Distler**

118. Paragraphs 1-117 are incorporated by reference as if fully set forth herein.

119. As averred above, after StoneMor fired Robey, Robey applied for a job at Roosevelt Cemetery in Bensalem, PA where she had three interviews.

120. As averred above, after Robey's third interview, Robey learned that she did not get the job at Roosevelt Cemetery

121. As averred above, Distler told Roosevelt Cemetery negative things about Robey's job performance, which are not true.

122. StoneMor and Distler interfered with Robey's prospective contractual relations with Roosevelt Cemetery, which caused Robey not to get the job with Roosevelt Cemetery.

123. StoneMor and Distler intended to cause harm to Robey by interfering with Robey's prospective employment with Roosevelt Cemetery.

124. StoneMor and Distler were not privileged or justified in its actions.

125. As a result of StoneMor and Distler's conduct, Robey has suffered actual damages.

WHEREFORE, Robey respectfully demands judgment in her favor and against StoneMor and Distler, jointly and/or severally, for actual damages it is determined that Robey lost as a result

of Defendant's unlawful conduct, punitive damages, interest, negative tax consequence damages, costs, equitable/injunctive relief, and such other relief as the Court deems proper.

**JURY DEMAND**

Plaintiff hereby demands a jury to try all claims triable by jury.

Dated: October 11, 2022

Stephanie J. Mensing
PA ID No. 89625
Mensing Law LLC
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(215) 586-3751; (215) 359-2741 fax
stephanie@mensinglaw.com
Attorney for Plaintiff

# Exhibit P-1

To: StoneMor Partners Human Resources

Attn: Michelle.

Michelle:

Below is a summary of my statement that we discussed during the interview on November 3, 2020.

For at least the last year and ongoing, I have been subjected to a Sexually Hostile work environment. I have been and continue to be harassed and retaliated against for speaking up and I have been discriminated against because of my Italian nationality. Bryan and Aimee call me the Italian Hot Head. The parties involved in this behavior are Bryan and Aimee, including since May 2020, Darlene.

I am subjected to explicit sexual language and gestures every day at work. Because I don't engage in that conduct- Brian and Aimee retaliate by taking away my sales, duty days, etc.

On or about September 2019- Aimee told employees including myself that a woman came in to visit Brian and they went up to the White House- he told her he pulled up her skirt and they had sex in the attic. A week later Brian addressed us all in a meeting that a rumor was circulating that he had sex in the White House. He denied this happened.

Most of the sexually explicit comments that Aimee makes are in the presence of Brian. He engages in that behavior rather than reporting it.

Aimee constantly talks about how many guys she slept with and how many she gives blow jobs to. She tells co-workers that many funeral directors make sexual statements to her.

When Juan was manager- Aimee made a comment that she thought Juan wanted to sleep with her.

Aimee makes comments about the size of Male employee penises.

She also makes comments about Brian's tight pants and the outline of his penis- Brian in turn jokes about it and will say he wore his tight pants for "**his girls**" today.

She also talks about the Vault guys sexually and then runs out of the office to flirt with them.

She says many inappropriate things and Bryan plays along.

She also fights w her daughter constantly on the phone. In front of everyone. It is very distracting when everyone is trying to work.

Brian has also made some crazy statements.
last week while I was on duty he pulled his pants zipper up and down in front of Aimee and I.

Brian on other occasions puts his leg up on the desk and wiggles the bottom half of himself in front of Aimee's face.

Last week, Brian and Aimee were having a conversation about her (minor) daughter growing up to be a stripper because she doesn't go to school.

Don overheard her talking on the phone about Monster cock and asked me if a family was with her- I said no- she's on the phone with her boyfriend.

In addition to the CRM, that we already spoke about, below are a few of my opportunities that Bryan took from me and gave to Darlene, but he had Aimee meet with the family and write the contract. Darlene got the commission.

10/23
Susan Lauterborn NOK of Charles Lombardo- Paul gave me IA to run for him because he couldn't do it. I had given him one the prior week – so it was a return favor.

10/24
I was on duty- Darlene answered phone told Keith Smith (an Opportunity) to come in to ask her. She was on duty that day but was on 3rd shift meaning she only gets IAs and look up . She does not get any opportunities that day. Keith called in to pre plan she took it when Don was 1st and I was 2nd on duty.

Later that day a 2nd IA was called in because Don got the 1st IA- I took this 2nd IA. NOK was Darryl Belinski . Darryl was waiting for his Aunt to pass away, Elinor Jackson. He had some questions and then I told to him to call me when he has the dates. That Sunday, October 25th, Darlene was on duty I called her to inform her about the IA siting on Mitzi's desk. that if the family calls in she can make the appt for me . I will be in for the Elinor Jackson IA. .

On Monday Oct 26th I was pulled again in the office told I had to give the IA to Darlene because Paul gave me his IA. (Charles Lombardo). I tried to explain that the IA that Paul gave me was because I had given him one the week before. I was also told I need to stop picking on Darlene. I denied ever being rude or "picking on Darlene.

I had mentioned in early October to Aimee that her and Darlene need to stop talking about Joe. Making fun of him and the way he looks. She disclosed to me that Darlene told her Joe's license was delayed because he has a DUI. This raises concern because what guarantees do I have that my personnel file is protected. She is a manager and has access to it.

Aimee spreads rumors about my son Joseph, She continuously says that he is gay and if he hasn't told me then he will eventually come out. She continues to ask me if he is gay and has had her boyfriend an Funeral Director, Danny Keegan, text my daughter's boyfriend, making fun of my 26 year old son Joseph, because they continually say he is gay.

August 17, 2020- I was in work that day- my cousin had passed away on August 16th. The family {Desiderio} purchased a private Niche from me at Saints Peter and Paul. I had an 11am appt. with Renee Robins we spoke about her grandmother purchasing the next grave over for her uncle. I gave her my info, we set up an appointment for that Friday and she left. Later that day, I left to go to my cousins house to design the niche.

Aimee called me at 145 pm to tell me that a family I was working with to pre plan. {Raymond Kenney}. Wanted to come in to purchase. I told her I would call him back to get him in that

night. Aimee offered to write the contract for me. I told Raymond that Aimee would meet with him that afternoon. It was a $7,808 sale.

On 8/19 Renee Robinsons Grandmother called in and asked for me- I wasn't in the office. Amy called to let me know that I don't need to speak to the family. So I took this issue to Don. Don was going to look into it, A week had passed so I followed up with Don. He advised that Bryan decided to give it to another counselor (Darlene) because Amy and I couldn't agree. On Monday morning I called Matt to let him know everything that was going on, that contracts and duty days were being take from me and given to Darlene, and that I wanted to transfer to Saints Peter and Paul because of the Hostile Work environment. Matt was going to look into it.

On Tuesday Bryan and Don brought me in to the office, told me I shouldn't transfer, and I had no right to complain to Matt because I made him {Bryan} look bad. In turn, Bryan wrote me up because he told me I left early and my attitude that week. I refused to sign the form and the following day I explained to Bryan that I didn't leave early on 8/17 that I was at an appointment, with my cousins family designing a Niche. I said he needed to void the write up and let Matt know. He refused and if I went to HR, I would be fired. I have working emails from that day and Denise Lydzinski can confirm that I was working that day.

Since May 2020 Bryan has given Darlene every marketized and internet lead. He does not distribute the leads fairly amongst the counselors. If you look at the contracts – Darlene doesn't meet with families or write the contracts and on other contracts we are told that we have to split commission with Darlene. He gives her the most days off and the most duty days.
He takes others off duty just to put her on duty.

She continually brings him gifts, including bottles of wine, gifts for his children (books, clothes). She refers to him as "My son".

He continues to allow Aimee and Darlene to bring their children to work even after being told not to. On Sunday October 18th Aimee brought her daughter to work from 10:30 to 1:30. I have witness both Darlene and Aimee bringing their children to work.

Everyday, I feel my job is threatened. Because I do not engage in the sexual conversations or gestures, I'm continually punished my either being written up for unsubstantiated claims that lack a factual basis, I am taken off my duty days, I am told I make to much money, I am told I am not allowed to ask about any families that I wrote contracts for or that were my leads. Bryan and Aimee both take contracts from me and give them to Darlene. Because of having to work under these conditions and being threatened I have and continue to suffer greatly emotionally and financially.

Enrichetta Robey
Family Service Counselor